**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**D3D TECHNOLOGIES, INC.,**

        **Plaintiff,**

**v.**                                              **Case No: 6:20-cv-1699-PGB-DCI**

**MICROSOFT CORPORATION,**

        **Defendant.**
_____/

## CLAIM CONSTRUCTION ORDER

This cause is before the Court to construct terms found within the 8,382,771 (the '771) patent, the 9,473,766 (the '766) patent, the 9,349,183 (the '183) patent, and the 9,980,691 (the '691) patent. The parties request the Court to construe these terms: "image slices," "collection of image slices"/ "a plurality of . . . image slices," and "polarized glasses."  (Doc. 76-1). The parties have agreed on the construction of the terms "volume," "volume of interest," and "cursor." Therefore, there are no terms in the 10,795,457 (the '457) patent that required construction. The parties filed claim construction briefs, (Docs. 64, 73), and a claim construction hearing was held on June 16, 2021 (Doc. 90).

**I.**      **BACKGROUND**

The technology is not difficult to grasp. D3D or Depth-3-Dimensional imaging, as Plaintiff describes it, "is directed to arranging two-dimensional image slices to build a three-dimensional volume that can be stereoscopically rendered

into different left and right eye viewing perspectives." (Doc. 64, p. 3). Whereas traditionally "volumetric datasets [such as CT, MRI, PET, and SPECT scans] . . . were viewed on 2D monitors using a slice-by-slice scrolling technique." (*Id.* at pp. 2–3).

Microsoft submits that "the patents disclose a system wherein cross sections of sequential image scans . . . are combined to compose a 3D image." (Doc. 73, p. 1). They argue that D3D's proposed constructions "eliminate the features at the heart of the 3D image viewing systems" disclosed in the patents; for example, by claiming the "'image slices' do ***not*** have to be sequential cross sections of an object." (*Id.*) [emphasis in original]. Defendant argues that "if the image slices were not sequential cross sections, none of the teachings of the D3D patents would work." (*Id.*). Whether the patented technology involves cross-sections of an object and a set of sequential cross-sections is the question. The parties also disagree over the proper construction of "polarized glasses" with Microsoft advocating a construction that requires the glasses to interact with a separate display to create a three-dimensional effect. (Doc. 76–1, p. 3).

## II. LEGAL STANDARD

The Court construes a patent claim as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). To construe claims, the Court begins with the words of the claims themselves. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Generally, the Court accords the words of a claim "their ordinary and customary meaning," which is

2

"the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[1] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (internal citations and quotation marks omitted). Persons of ordinary skill in the art do not read the claim term in isolation, but in the context of the entire patent. *Id.* at 1313. If the ordinary meaning of claim language is "readily apparent even to lay judges," then claim construction requires "little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. But because the meaning of a claim term as understood by a person skilled in the art is often not immediately apparent, the Court looks to both intrinsic evidence (the words of the claims themselves, the specification, and the prosecution history) and extrinsic evidence (sources like dictionaries and expert testimony). *Id.* at 1314 (internal citations and quotation marks omitted); *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1328 (Fed. Cir. 2008).

The patent's specification is "the single best guide to the meaning of a disputed term," as it may reveal that the patentee intended a special definition to apply to a claim term that differs from its ordinary meaning or that the patentee intentionally disclaimed, or disavowed, the claim's scope. *Phillips*, 415 F.3d at 1315–16 (internal citations and quotation marks omitted). Extrinsic evidence, such

---

[1] The parties define a person of ordinary skill in the art (**"POSITA"**) as possessing at least a bachelor's degree in a relevant field, such as physics, optics, electrical engineering, or computer science, and having at least two or more years of relevant experience. (Docs. 64, pp. 6–7; 73, p. 2, n.1).

as expert testimony and dictionary definitions, is helpful but "less significant than the intrinsic record." *Id.* at 1317 (citations and quotation marks omitted). While dictionaries and treatises are relevant, the Court must ensure that the dictionary definition does not contradict a definition "found in or ascertained by a reading of the patent documents." *Id.* at 1322–23 (quoting *Vitronics*, 90 F.3d at 1584 n.6). "In sum, extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.[2]

Finally, "[d]istrict courts have an obligation to construe terms when it is necessary to resolve a genuine and material legal dispute between the parties." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361–62 (Fed. Cir. 2008); *see also E-Pass Tech., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1219 (Fed. Cir. 2007) ("[A]ny articulated definition of a claim term ultimately must relate to the infringement questions that it is intended to answer."). The party requesting the Court to construe a claim term must demonstrate that the construction is both

---

[2] Several other principles guide the Court's construction of claim terms. First, the Court presumes that the same terms appearing in different portions of the claims have the same meaning, unless the specification and prosecution history clearly demonstrate that the terms have different meanings at different portions of the claims. *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). Courts are further cautioned that, "a construction that renders the claimed invention inoperable should be viewed with extreme skepticism." *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002) (citation omitted), vacated and remanded on other grounds, 537 U.S. 802, 123 S. Ct. 70 (2002). It is also improper to limit the claims to the specific examples, or embodiments, set forth in the specifications. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). Moreover, unclaimed embodiments that contradict the language of the claim cannot be used in construing the claim. *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008). Stated differently, the claim cannot be construed to include embodiments set forth in the specifications but not contained within the claim.

necessary and correct; that is, construction of the claim term must be fundamental to issues of infringement or invalidity, and the Court may not issue an advisory opinion. *IP Cleaning S.p.A. v. Annovi Reverberi S.p.A.*, No. 18-cv-147, 2008 U.S. Dist. LEXIS 102312, *3 (W.D. Wisc. Dec. 17, 2008).

### III.   AGREED TERMS

| Claim Term | Agreed Construction |
|---|---|
| "volume" ('771 patent claims 1, 3, 5#8, 10, 12–15, 17, 19–21); ('183 patent claims 1–4, 7–10, 13–16); ('691 patent claims 1–9, 12–21); ('457 patent claims 70–78, 80, 84, 88–97, 99, 103, 107) | One or more three-dimensional pixels |
| "volume of interest" ('771 patent claims 1, 3, 5–8, 10, 12–15, 17, 19–21) | One or more three-dimensional pixels selected by a user |
| "cursor" ('691 patent claims 1–9, 12–21); ('457 patent claims 70–78, 80, 84, 88–97, 99, 103, 107) | An indicator movable within a three-dimensional image, image space, and volume |

### IV.   DISPUTED TERMS

The parties have identified three (3) disputed claim terms. (Doc. 76-1). The Court will address the disputed claim terms in the order presented by the parties at the *Markman* hearing.

5

A. **"image slices"**

| Claim Term | D3D's Construction | Microsoft's Construction |
|---|---|---|
| "image slices" | Plain and ordinary meaning.<br><br>**Alternatively, if the Court determines a construction is needed**, "one or more sections or segments of a volume" | Cross-sections of an object |

*1. D3D's Proposed Construction*

D3D asserts the Court need not construe this term and it should be given its plain and ordinary meaning.[3] (Doc. 64, p. 14). D3D reasons that a POSITA would know that "image slices" are generated by several known devices, including CT, MRI, PET, and SPECT scanners and that, in the patents, the image slices are combined to form a volume of interest. (*Id*. at pp. 14–15). Plaintiff directs the Court to language in the specifications, including:

> Mechanisms and techniques that provide a process for combining slices generated by medical imaging devices to create a volume of interest and then presenting this volume in three-dimensional representation to a Head Display Unit (HUD) so that the Radiologist/Medical Professional (R/MP, also referred to herein as a user) can obtain a holistic view is described.

('771 patent, 4:59–65). Another example cited by D3D provides:

> The images are sent to a head display unit 22 worn by the user 24. The head display unit 22 displays image 18 to the right eye. Note that multiple slices have been stacked,

---

3   Alternatively, D3D proposes "one or more sections or segments of a volume."

6

> creating a volumetric mass so that the image seen by the right eye is the volume of interest selected by the user. The head display unit 22 also displays image 20 to the left eye similar to the manner of which the right image was displayed. This produces a three-dimensional image to the user 24.

('771 patent, 5:27–34). And the parties agree on constructing "volume of interest."

D3D reiterated this argument at the claim construction hearing, noting that "people of ordinary skill in the art have been dealing with these image slices and how to process them and view them and systems and methods to manipulate them for more than 50 years." (Doc. 90, 7:17–20). D3D described the patents as "agnostic" to the source of the image slices, as described in the specification: "Any imaging system which can generate cross-sections may be used in this process . . . In addition, though this process is described with respect to medical imaging, it should be understood that embodiments of the present invention may be used for non-medical purposes." ('771, 7:31–43).

### 2. *Microsoft's Proposed Construction*

Microsoft proposes that "image slices" should be construed as "cross-sections of an object." (Doc. 73, p. 8). Microsoft submits its construction is the "only interpretation that makes sense in the medical context." (*Id.* at p. 9). For example, the specification describes "cross-sectional imagery which is gathered over a cardiac cycle." (*Id.* quoting '771 patent, 13:58–60). Microsoft notes that Figure 8 provides "three-dimensional viewing of images by a user, and the specification state that '[a]ny imaging system which can generate cross-sections may be used in this process . . . .'" (*Id.* quoting '771 patent, 7:30–35). Microsoft

7

argues the prior art considered and cited during the examination of the '771 patent supports its proposed construction. (*Id.* at p. 10). Two patents considered by the examiner, the 6,115,449 ("Jang") patent and the 4,472,737 ("Iwasaki") patent, according to Microsoft, use "slice" interchangeably with "cross section" and "ties 'image slices' to cross-section of an object."[4] (*Id.*). Accordingly, Microsoft contends image slices should not be defined in terms of "sections" or "segments," as proposed by D3D in its alternative construction. (*Id.* at p. 9). Microsoft further notes that the term "sections" and "segments" never appear in a specification. (Doc. 90, 20:6–7).

Microsoft argued at the claim construction hearing that "slices" has to be construed as cross-sections for the patents to work. (*Id.* 20:13–17). For example, in medical image devices, a cross-sectional image of the body (or body part) is taken after which one derives a volume of interest.[5] (*Id.* 20:21—21:2). One selects a piece from that volume, arrange the slices and select a viewpoint of the slices. (*Id.* 21:2–8). Microsoft contends that selecting bits and pieces, or segments, does not create a comprehensive image which is the point of the patented technology. (*Id.* 21:9–14). Microsoft submits this logic applies whether the patents are considered in the medical imaging space or otherwise. (*Id.* 22:23–25).

---

[4]  Figure 1 in "Iwasaka" depicts complete, as opposed to partial, cross-sections of a head.

[5]  *See* '691 patent, 7:59—8:2 ("First all cross-sections taken at a given time interval are stacked to form a volume of interest (for each time interval, a unique volume is generated)"). *See also,* '771 patent, 6:34–40 ("Referring now to FIG. 4, the user selects a volume of interest, which is comprised of a series of slices . . . . These slices are then stacked one upon another in the sequence in which they were generated.")

8

### 3. *Court's Construction*

The Court agrees with D3D that Microsoft's proposed construction includes the term "object" which is not in the claim. (Doc. 90, 9:22—10:2). D3D emphasizes this point with Figure 9, a box within which there is an image of a person with multiple highlighted areas. (*Id.* 10:4–15). The box includes white space around the body, and that space is not an object. Thus, limiting image slices to a cross-section of an "object" contradicts the patent and imposes a limitation not provided for in the patent. Granted it may simply be a matter of semantics because it is difficult to conceive how one could cross-section something other than an object. With that, the Court declines to expressly add a limitation not present in the patents-in-suit.

As to the dispute over the meaning of "cross-section," D3D acknowledges the specification has "many instances where they talk about the image slices being cross sections." (*Id.* 10:19–24). As Microsoft has illustrated in its briefing and at the claim construction hearing, the claims and specifications refer only to image slices and not sections or segments. The image slices result from cross-sections taken at a time interval are stacked to form a volume of interest. The patents do not teach that image slices are something less than cross-sections. However, and using medical imaging as an example, a cross-section may not be of an entire body and can be limited to the spinal column or the heart. Image slices are cross-sections and not bits and pieces, as Microsoft puts it.

| **Court's Construction: "image slices"** |
|---|
| "cross-sections of a volume" |

**B.     "collection of image slices"/ "a plurality of image slices"**

| Claim Term | D3D's Construction | Microsoft's Construction |
|---|---|---|
| "collection of 'image slices'"/ "a plurality of . . . 'image slices'" | Plain and ordinary meaning.<br><br>Alternatively,<br><br>"a collection of 'image slices'"/ "a plurality of . . . 'image slices'" | a set of sequential "image slices" |

The dispute is over whether the "collection" or "plurality" of "image slices" must be a "set" and "sequential."

   *1.     D3D's Proposed Construction*

In their *Markman* brief, D3D objects to Microsoft's proposed construction of "collection" and "plurality" with the word "set." (Doc. 64, p. 17). D3D observes that the Federal Circuit has repeatedly held that the plain and ordinary meaning of "plurality" is "two or more." *See e.g., Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 F.App'x 603, 606 (Fed. Cir. 2007). (*Id.* at p. 18). D3D contends the plain meaning of "collection" "connotes some form of relationship between the 'image slices,' where plurality' does not necessarily indicate such a relationship. (*Id.*). Therefore, Microsoft's proposed construction which adds the qualifier "sequential"

10

is overly narrow, is not required by the patents, and contradicts the plain meaning of "collection" or "plurality." (*Id.*). Accordingly, D3D advocates for the plain and ordinary meaning of "collection" and "plurality." (*Id.*).

  D3D avers that Microsoft is substituting the word "set" for collection and plurality which is not the purpose of claim construction. (Doc. 90, 14:2–6). Second, they argue the term "sequential" does not appear in the claim. (*Id.* 14:11–12). D3D notes that an MRI may take image slices 1 through 10, and the operator only wants to view slices 1, 3, and 5, questioning if this would meet Microsoft's definition of sequential. (*Id.* 14:16–23). Raising the next question which is "does sequential mean contiguous?" (*Id.* 14:22–23). D3D argues a POSITA would recognize from the specifications that image slices are not necessarily contiguous. The '771 patent, 7:61–67 provides in part:

> At this point, the processor forms a stack of the image slices in a sequential order, which then represents the volume of interest. <u>In many cases</u>, the image slice is of a thickness that the composite stack is a contiguous volume. In the event that this is not the case, the software will interpolate between like elements (e.g., tissues) from slice to slice to create a contiguous volume.

(Doc. 64–1).

D3D contends "the patentee has contemplated the fact that these slices are not necessarily contiguous, and they talk about how the software can simply fill in the gaps." (Doc. 90, 16:15–18).

11

### 2. *Microsoft's Proposed Construction*

Microsoft submits "[t]he intrinsic evidence consistently, repeatedly, and exclusively indicates that a collection or plurality of image slices must be a sequential set of images." (Doc. 73, p. 12). For example, the '771 patent, 7:44–63, discusses "selecting a volume of interest from a collection of image slices . . . . At this juncture, the processor interacts with the stored sequential file of image slices and selects the slices which correspond to the *user directed area of interest*." (emphasis added).[6] The '771 patent further teaches that "[a]t this point, the processor forms a stack of the image slices in a sequential order, which then represents the volume of interest." *Id.* Microsoft argues that "the sequential ordering of the set of image slices is necessary to properly create the contiguous volume described by the patent." (*Id.* at p. 13). While Microsoft contends D3D advocates for "non-sequential slices" which "would result in a system that cannot generate 3D volumes according to the preferred embodiment," this is not the case. (*Id.*). D3D merely asserts that non-sequential images can be selected by the user and then arranged in a sequence to generate the 3D volume, and Microsoft agrees the image slices may correspond to the user directed area of interest.

---

[6]   The user's ability to select non-contiguous images which are then arranged into a sequence is consistent with the definition of a "volume of interest" which is one or more three-dimensional pixels *selected by a user*. Microsoft is not incorrect that a "collection" or "plurality" cannot be a "hodgepodge of slices without any precise ordering," (Doc. 73, p. 13), but the user is the one who selects the slices which are then placed into a sequence for viewing by the processor.

12

### 3. *Court's Construction*

The Court finds "collection of image slices" and "a plurality of image slices" should be accorded their plain and ordinary meaning. Persons of ordinary skill in the art do not read the claim term in isolation, but in the context of the entire patent. *Phillips*, 415 F.3d at 1313. A POSITA would understand the meaning of "plurality" and "collection" and would appreciate that image slices selected by the user and thereafter placed in sequence by the program to create the 3D volume. Microsoft's proposed construction unnecessarily narrows the claims and could cause the jury to incorrectly conclude that the user may not select image slices that are not contiguous in creating the 3D volume. The claim terms will be given their plain and ordinary meaning.

### C. "polarized glasses"

| Claim Term | D3D's Construction | Microsoft's Construction |
|---|---|---|
| "polarized glasses" | Plain and ordinary meaning.<br><br>Alternatively,<br><br>a lens, optical instrument or material that induces polarization | Lenses that enable viewing filtered imagery on a separate display to create a three-dimensional effect |

The dispute is over whether the "polarized glasses" must be separate from the display and able to create a three–dimensional effect.

13

### *1. D3D's Proposed Construction*

D3D contends the term "polarized glasses" requires no construction since a POSITA would understand the term in the context of the '766 patent. (Doc. 64, p. 19). D3D supports their position by citing two exemplary embodiments, one of which describes "linearly polarized eyeglasses which also contain a pair of orthogonal polarizing filters oriented the same as the projector," and the other detailing how "two images are projected superimposed onto the same screen 718 through circular polarizing filters of opposite handedness." (*Id.* quoting '766 patent, 17:32–48). In the latter exemplar, "[l]ight may be polarized by reflection or by passing it through filters, such as certain crystals, that transmit vibration in one plane but not in others." (*Id.* quoting '766 patent, 17:42–48).

D3D submits there is no need to add "worn" or "for viewing imagery," and "on a separate display," as suggested by Microsoft. (*Id.* at p. 20). For example, claim 1 of the '766 patent teaches "[a] method of three-dimensional viewing of images by a user comprising . . . wherein a user wearing polarized glasses is able to view . . ." D3D argues it is clear the polarized glasses are "worn" and are used for "viewing imagery." (*Id.* at p. 21). The '766 patent teaches that the invention "could be utilized with other display units (beside a head display unit), including but not limited to, a display unit incorporating polarized lenses, a display unit wherein multiplexed images are viewed via shuttered lenses, virtual reality displays . . . and other types of three-dimensional (3D) displays as would be known to one of reasonable skill in the art." (*Id.* quoting '766, 17:25–29). Finally, D3D argues that

14

Microsoft's proposed language "to create a three-dimensional effect" is overly narrow and fails to explain polarization. (*Id.* at pp. 21–22).

During the claim construction hearing, counsel for D3D stated, "I don't think there's any dispute that the display is separate from the glasses," lens, or the optical instrument. (Doc. 90, 55:5–7; 55:22–23; 58:4–7, 19–21). D3D submits there is no reason to use the term "separate" display as Microsoft advocates, because there is only one display in the claim. (*Id.* 55:23—56:1). The Court, and D3D agreed, that Microsoft's proposed construction appears designed to clarify that the display is not the lens. (*Id.* 59:4–7). D3D argued that the claim already describes projecting the left and right images onto the display, causing a POSITA to understand that the display is not the lens. (*Id.* 59:18–22; 61:10–15). D3D further explained that the 3D effect is created by "passing this imagery through the polarized filters that are then projected onto the display. Putting the glasses on simply enables the user to see the 3D image. It does not create the three-dimensional effect." (*Id.* 62:19–23). The term "three-dimensional effect" does not appear in the claim. (*Id.* 64:14–17).

### 2. *Microsoft's Proposed Construction*

Microsoft asserts that "the dispute centers around whether the glasses must be used to show images on a separate display." (Doc. 73, p. 15). Microsoft's proposed construction requiring a "display" which is distinct from the lens or glasses is agreed to by D3D; therefore, the Court will not address Microsoft's citations to the '766 patent supporting this proposition. The next issue is "whether

15

the polarized glasses are, in fact, responsible for creating the three-dimensional effect." (Doc. 90, 67:11–13). First, Microsoft contends D3D's proposed construction will confuse the jury and is so broad as to render the claimed invention inoperable. (*Id.* 67:19—68:4). For example, the proposed term "optical instrument" is not defined and theoretically includes polarized sunglasses. (*Id.* 68:8—69:3). Similarly, the proposed construction refers to "a lens" whereas "claim 4 of the '766 patent, . . . specifically states that the polarized glasses, . . . have a left lens and a right lens" and so "lenses or a pair of lenses" is required. (*Id.* 69:19–23).

The '766 patent teaches the interplay between the polarized glasses (or lenses), and the images projected onto the display, as follows:

> As shown in FIG. **14** the images **710** and **712** generated by the process described above for the left eye viewing point (LEVP) and right eye viewing point (REVP) could be superimposed and projected onto a single flat screen display **718** through the use of techniques such as polarizing filters **714** and **716.** The medical personnel **720** viewing the imagery would wear glasses **722** corresponding to the techniques used to display images . . . and the desired 3D effect achieved.

('766, 17:4–15).

The end result is that filtered imagery is projected onto the display, but it will not appear to be three-dimensional without the polarized glasses/lenses. The plain and ordinary of "polarized glasses" does not convey this meaning. As D3D stated during the claim construction hearing, "the glasses are not creating, meaning generating, the 3D effect. They're simply allowing you to see the 3D effect that already exists." (Doc. 90, 75:13–18).

16

### *3. The Court's Construction*

The Court construes "polarized glasses" as follows: lenses that enable viewing filtered imagery on a display in three-dimension.

**DONE AND ORDERED** in Orlando, Florida on December 3, 2021.

_____
PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

17